IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JOHNNIEMAE GREEN,

              Plaintiff,

      v.

JOHN E. POTTER, POSTMASTER
GENERAL, UNITED STATES POSTAL
SERVICE

           Defendant.

HON. JEROME B. SIMANDLE

Civil No. 08-597 (JBS/KMW)

**OPINION**

APPEARANCES:

Patricia A. Barasch, Esq.
SCHALL & BARASCH, LLC
Moorestown Office Center
110 Marter Avenue
Suite 302
Moorestown, NJ 08057-3124
    Counsel for Plaintiff Johnniemae Green

Paul J. Fishman
United States Attorney
    By:  Irene E. Dowdy
         Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
401 Market Street, Fourth Floor
Camden, NJ 08101
    Counsel for Defendant John Potter, Postmaster General

**SIMANDLE**, District Judge:

    Presently before the Court is a motion for summary judgment brought by Defendant John Potter, United States Postmaster General [Docket Item 37].  Plaintiff Johnniemae Green, a United States Postal Service ("USPS") employee, asserts that Defendant discriminated against her based on race and gender when it placed

a white, male employee in Plaintiff's preferred job and gave Plaintiff her third choice position.  Plaintiff also asserts that she was subjected to a hostile work environment.  She seeks relief under Title VII of the Civil Rights Action of 1964.[1] Defendant argues that Plaintiff has not offered sufficient evidence to rebut Defendant's proffered non-discriminatory explanation for the employment decision, that she failed to exhaust her administrative remedies regarding any hostile work environment claim, and further that no reasonable fact-finder could find that she was subjected to a hostile work environment. For the reasons expressed below, the Court will grant Defendant's motion for summary judgment in its entirety.

I.    **BACKGROUND**

   **A.   Facts**

   The relevant evidence in the record with be presented herein, with all facts construed in favor of Plaintiff as the non-moving party.  Plaintiff, an African American woman, has been a USPS employee since November 1980.  (Green Decl. ¶¶ 1-2.) Beginning in February 2003, Plaintiff became a Manager,

---

[1] To the extent that Plaintiff's Amended Complaint raises other potential causes of action (for example, retaliation under Title VII, age discrimination under the Age Discrimination in Employment Act ("ADEA"), or claims based on her detail assigment), Plaintiff has not offered any argument in support of such claims in her opposition to this motion for summary judgment.  The Court will therefore grant Defendant summary judgment as to such claims.

Distribution Operations ("MDO") at the Philadelphia Logistics and Distribution Center ("Philadelphia L&DC") in Swedesboro, New Jersey. (Green Dep. at 33; Stewart Decl. ¶ 5.)  Plaintiff was assigned to Tour 3, a shift which generally lasted from late afternoon until after midnight, and was grade EAS-21 (meaning Executive and Administrative Salary level 21). (Green Dep. at 33-35; Stewart Decl. ¶ 5).  As MDO for Tour 3, Plaintiff was responsible for managing all automated, mechanized, and manual mail processing and distribution operations. (Green Decl. ¶ 10.)

In April 2004, USPS sent Brian Stewart to Philadelphia L&DC to be the acting plant manager (the position became permanent in July 2004). (Stewart Dep. at 20.)  For the first few weeks after Stewart's arrival, Stewart made no effort to meet Plaintiff, though as a general rule the first thing a plant manager would do on arriving at the plant would be to meet those who directly report to the manager. (Green Dep. at 76.)  Concerned that she would have problems working with Stewart, Plaintiff called Andy Keen in the USPS human resources department and told him that she believed Stewart to be "biased." (Id. at 77, 81-82.)  Mr. Keen told Plaintiff to discuss her concerns with Stewart. (Id. at 78-79, 82.)  Two weeks after he arrived Stewart held a staff meeting that Plaintiff attended.[2] (Id. at 41-42.)  At this meeting

---

[2] Plaintiff asserts in her statement of undisputed fact that she was not invited or informed of the staff meeting. (Pl. Statement ¶ 23.)  There is no evidence in the record to support

Plaintiff met Stewart for the first time, though everyone else in the meeting had already met Stewart.[3]  (Id.)

Soon after Stewart arrived at the Philadelphia L&DC, the USPS Philadelphia District Manager told Stewart that the facility had a high error rate for processing and dispatch of Priority Mail and informed him that he needed to fix the problem promptly. (Stewart Decl. ¶ 6; Stewart Dep. at 44.)  To correct the problem, Stewart created an assignment for a Quality Improvement Manager ("QIM") which was to be a temporary or "detail" assignment. (Stewart Dep. at 49.)  Within two or three weeks after his arrival, Stewart asked Plaintiff to take the QIM position and she accepted.  (Green Dep. at 35, 43-44.)  Stewart testified that he asked Plaintiff to take the position because when they discussed the assignment she expressed interest and because she had experience on Tour 3 (Stewart Dep. at 53); Stewart wanted an existing MDO who was familiar with the facility (Stewart Decl. ¶ 7).  The QIM position was generally a day shift, or Tour 2, but

---

these assertions; rather, Plaintiff testified that she and others learned about the meeting from Ken Sell, another MDO.  (Green Dep. at 41-42.)

[3] Plaintiff testified that at some point in time USPS employee Anthony Key told Plaintiff that USPS employee Alva Hall told Key that Hall had overheard Stewart call Plaintiff a "black gorilla."  (Green Dep. at 119.)  Hall testified that she never heard Stewart call Plaintiff a "black gorilla."  (Hall Dep. at 65-66, Def. Exh. 34.)  Plaintiff's recitation of this double-hearsay is inadmissible and cannot be considered as evidence opposing summary judgment, as discussed below in Part II.B.

Plaintiff officially kept her Tour 3 MDO position with the same EAS-21 compensation.[4]  (Stewart Decl. ¶ 8.)

As QIM Plaintiff no longer had managerial authority.  (Green Decl. ¶ 20.)  Four months after she began her detail Plaintiff asked Stewart to return her to her Tour 3 MDO position and Stewart told her "not at this time," because he wanted her to learn about staffing.  (Green Dep. at 83-84.)  During the first three months of 2005, Plaintiff twice asked Stewart to return to her permanent job and Stewart refused both times.  (Green Dep. at 86-87; Green Dep. Exh. 2.)  On April 8, 2005, Plaintiff made another request and this time Stewart arranged a meeting.  (Green Dep. Exhs. 3 & 4.)  Stewart again told Plaintiff that he wanted her to remain in QIM, explaining that while quality had improved somewhat, it had declined again, and he wanted Plaintiff to learn more about staffing and plant support.  (Green Dep. at 97-99.)  Finally, in December 2005, Plaintiff asked Stewart to return to her permanent assignment and Stewart declined because it was the

---

[4] For the first few weeks of her QIM, Plaintiff continued to receive "night differential" -- that is additional pay for the hours between 6 p.m. and 6 a.m. -- even though she was not regularly working during those hours, because a clock automatically recorded her hours to be those for Tour 3.  (Green Dep. at 56, 58-59.)  At some point the automatic clock was changed (Plaintiff doesn't know by whom) so that Plaintiff was no longer receiving "night differential." (Id. at 60.)  Five or six months after she began her detail, Plaintiff learned that another USPS employee, a white male, who was on detail was receiving night differential pay.  (Id. at 65-68.)  Plaintiff offers no evidence that Brian Stewart knew about this issue or was responsible for night differential pay.

holiday season and he assigned Plaintiff to manage operations in an annex building. (Green Dep. at 101; Stewart Decl. ¶ 17.)

Plaintiff states that while she was on her QIM detail, she "was regularly excluded from staff or MDO meetings, or both, whereat discussions and reviews relevant to plant distribution and processing operations were held." (Green Decl. ¶ 17.) Other managers and supervisors, who were not African American, attended these meetings. (Id. ¶ 18.) According to Plaintiff, discussions at these meetings were relevant to the questions asked during her subsequent job interview with Stewart. (Id. ¶ 17.)

In mid-January 2006, Stewart was placed on a detail in the USPS Area Office in Pittsburg, Pennsylvania. (Stewart Dep. at 95; Stewart Decl. ¶ 18.) Frank Pierantozzi, a white male, became acting plant manager at the Philadelphia L&DC. (Stewart Dep. at 95-96.) One day while Pierantozzi was acting manager, Plaintiff took her hair out of braids (her usual hair style) and wore a ponytail, and Pierantozzi told her that he liked her hair better in a ponytail. (Green Decl. at 126.)

In a memorandum dated December 22, 2005, the USPS Chief Human Resources Officer announced that management staffing at the various L&DCs would be restructured, eliminating EAS-21 MDO positions so that current managers would have to apply for the newly created positions. (Def. Exhs. 3-10.) The restructure created four new MDO positions: (1) MDO, EAS-22, Tour 3

6

(sometimes referred to as "Lead MDO"); (2) MDO, EAS-20, Tour 1; (3) MDO, EAS-20, Tour 3; and (4) MDO, EAS-19, Tour 2. (Id.) Current MDOs who held EAS-21 positions and who were hired for EAS-20 positions would keep the same salary. (Id.) Applicants were required to complete PS Form 991, Application for Promotion or Assignment, for each position and mail the forms to the USPS Human Resources Office for the Eastern Area by May 10, 2006. (Id.) Plaintiff submitted applications for all four MDO positions and cannot remember whether she communicated, in writing or otherwise, her preferences to anyone. (Green Dep. at 135-36.) She preferred the MDO positions in this order, from highest preference to lowest preference: (1) MDO, EAS-22, Tour 3 (Lead MDO); (2) MDO, EAS-20, Tour 3; (3) MDO, EAS-20, Tour 1; and (4) MDO, EAS-19, Tour 2. (Id. at 134-35.)

While Stewart, as plant manager for Philadelphia L&DC, was responsible for filling the new MDO positions, USPS Human Resources determined who was qualified to apply for each position. (Stewart Decl. ¶ 23.) Stewart had the "option of designating a review committee or personally interviewing every applicant" and he chose to make the selections himself. (Stewart Dep. at 107-08.) On June 9, 2006, Stewart interviewed the seven eligible applicants for the Lead MDO position; five white male applicants, including Thomas Bissell, one white female applicant, Therese Bonhage, and Plaintiff. (Id. at 132-133; Stewart Decl. ¶

30.)  For each interview Stewart asked each applicant a set of
questions he had composed and kept contemporaneous notes.  (Def.
Exhs. 19-25.)  According to Stewart's notes, Plaintiff gave
incorrect responses, or gave no response, to thirteen out of
twenty-five questions.  (Def. Exh. 22.)  For one question, she
gave an answer of 3.5%, when the correct answer was 4%.  (Id.)
Stewart found that Thomas Bissell gave only one incorrect answer
-- he failed to note that an employee who arrives at work with
alcohol on his breath should be referred to the Employee
Assistance Program.  (Stewart Decl. ¶ 35; Def. Exh. 20.)  For one
question, Bissell gave an answer of 6.4 million, when the actual
number was 6.3 million, but Stewart considered it close enough to
be correct.  (Def. Exh. 20; Stewart Dep. at 149.)

     After the interview process was complete for all the MDO
positions, Stewart assigned those positions as follows: Tour 3
MDO, EAS-22 (Lead MDO) went to Thomas Bissell; Tour 3 MDO, EAS-20
went to Theresa Bonhage; Tour 1 MDO, EAS-20 went to Plaintiff;
and Tour 2 MDO, EAS-19 went to Frank Pierantozzi.  (Def. Exh.
26.)  In response to questions from a USPS Equal Employment
Opportunity ("EEO") investigator, Stewart explained that he chose
Bissell over Green for the Lead MDO position based on their
disparate performances during the interview.  (Stewart Dep. Exhs.
7 & 8.)  In his deposition, Stewart explained that he did
consider each applicant's Form 991 and any previous performance

evaluations, but that he relied on the interview for making his decision "because it was very specific, simple questions that anybody who worked in the facility should know the answers to." (Stewart Dep. at 156-60.)  James Hull, Stewart's supervisor, concurred in the appointments and stated in response to EEO investigator questioning: "In the discussion with the selecting officer [regarding the appointments], I ask[ed] for a verbal account of the reasons for the selections, which in this case included a recounting of the applicants performance while working for the selecting official and the interview process."  (Pl. Exh. D.)

In September 2006, Plaintiff submitted a EEO complaint to USPS in which she recounted Stewart's refusal to remove her from her QIM detail and his decision to appoint Thomas Bissell to Lead MDO position.  (Def. Exh. 29.)  With respect to any allegations of a hostile work environment, Plaintiff stated the following in her EEO complaint:

> COUNT III - NEGLIGENCE
> (Against Defendant Postal Office)
> 26)  Defendant Postal Office had a duty to plaintiff to act with reasonable care in providing a reasonably non-hostile work place and maintaining such in a reasonable manner.  Defendant Postal Office failed to act with reasonable care towards plaintiff, and breached such duty by, among other things failing to maintain a fair competition among Swedesboro Job applicants for the impacted employees.

(Def. Exh. 29.)  In addition, in response to the EEO investigator's questions, Plaintiff stated that, "I have told

Randy Gerner and Frank Pierantozzi that I feel like I am still in a hostile work environment." (Pl. Exh. F.) The USPS Office of EEO Compliance and Appeals accepted one issue for investigation[5] -- Plaintiff's claim that she was discriminated against when she was denied the EAS-22 MDO position -- but gave Plaintiff an opportunity to express her disagreement with the defined accepted issue within seven days. (Defs. Exh. 30.) Plaintiff requested additional time to respond, but ultimately did not challenge that decision. (Def. Exh. 31.) On January 26, 2007, USPS found no discrimination in the denial of the Lead MDO position.

**B.  Procedural History**

On January 30, 2008, Plaintiff and her husband, Norman Green, brought suit against Defendant Potter, Stewart, and USPS seeking relief under 42 U.S.C. § 1981, Title VII, and the ADEA. The Court subsequently granted Defendant's partial motion to dismiss, dismissing all claims by Mr. Green, all claims against USPS and Stewart, all claims under § 1981, and all claims arising out of Plaintiff's involuntary reassignment in June 2007. On January 29, 2010, Defendant submitted the instant motion for summary judgment and briefing is now complete, making the motion

---

[5] The USPS identified three other issues raised -- appointment to the QIM detail, refusal to return her to her MDO Tour 3 position, and refusal of cross-training -- but dismissed those claims as untimely. (Def. Exh. 30.) As previously discussed, see note 1, Plaintiff does not raise those claims here, instead focusing on the denial of the Lead MDO position.

ripe for review.

**II.  DISCUSSION**

    **A.    Standard of Review**

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

"[T]he nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered." U.S. v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e))(citations omitted).

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In

> such a situation, there can be "no genuine issue as
> to any material fact," since a complete failure of
> proof concerning an essential element of the
> nonmoving party's case necessarily renders all
> other facts immaterial.

Celotex, 477 U.S. at 323.

### B.   Race and Gender Discrimination

Defendant asks the Court to enter summary judgment in its favor because, Defendant argues, Plaintiff has failed to adequately rebut Stewart's non-discriminatory reason (Plaintiff's poor performance during the interview as compared to Bissell's performance) for denying Plaintiff the Lead MDO position. Plaintiff responds that Stewart's decision to handle appointments on his own rather than through a panel, his allegedly inconsistent explanations for his hiring decision, his method for grading the two tests, his refusal to release Plaintiff from her QIM detail, and her exclusion from meetings, all provide evidence from which a jury could find that Stewart's reason was pretextual.  For the reasons to be explained below, the Court finds that Plaintiff has failed to present sufficient evidence from which a fact-finder could doubt Defendant's non-discriminatory explanation for the hiring decision and will grant Defendant summary judgment.

The parties agree that the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), is applicable to Plaintiff's Title VII claim.  Under McDonnell

_Douglas_, once Plaintiff establishes a prima facie case of discrimination, Defendant has the burden to produce a legitimate, non-discriminatory explanation for the allegedly discriminatory employment action.  _Id._  In the present case, it is similarly undisputed that Plaintiff has established a prima facie case of discrimination, because she has shown that she is a member of a protected class based on both her gender and her race, that she was qualified for the Lead MDO position and denied the position, and that a similarly situated individual not in her protected class was appointed to the position.  _See id._  Defendant has offered a non-discriminatory reason for Defendant's decision not to appoint Plaintiff to the Lead MDO position; namely, Defendant offers Stewart's explanation that he chose Bissell over Plaintiff because Bissell performed much better in the interview.

As a consequence, the dispute turns on the third stage of the _McDonnell Douglas_ analysis, at which Plaintiff must be given an opportunity to show that Defendant's proffered reason for the employment decision was merely pretext for discrimination. _Id._ at 804.

> [T]o defeat summary judgment when the defendant answers
> the plaintiff's prima facie case with legitimate,
> non-discriminatory reasons for its action, the plaintiff
> must point to some evidence, direct or circumstantial,
> from which a factfinder could reasonably either (1)
> disbelieve the employer's articulated legitimate reasons;
> or (2) believe that an invidious discriminatory reason
> was more likely than not a motivating or determinative
> cause of the employer's action.

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

> To meet the first prong of the Fuentes analysis,

> the plaintiff cannot simply show that the employer's
> decision was wrong or mistaken, since the factual dispute
> at issue is whether discriminatory animus motivated the
> employer, not whether the employer is wise, shrewd,
> prudent, or competent.  Rather, the non-moving plaintiff
> must demonstrate such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the
> employer's proffered legitimate reasons for its actions
> that a reasonable factfinder could rationally find them
> unworthy of credence.

Keller v. Orix Credit Alliance, 130 F.3d 1101, 1108-1109 (3d Cir.

1997) (quoting Fuentes, 32 F.3d at 765).  For the second prong,

"the plaintiff may show that the employer has previously

discriminated against her, that the employer has discriminated

against other persons within the plaintiff's protected class or

within another protected class, or that the employer has treated

more favorably similarly situated persons not within the

protected class."[6]  Simpson v. Kay Jewelers, 142 F.3d 639, 645

(3d Cir. 1998).

    The Court will first address Plaintiff's argument that

Stewart's explanation is not to be believed because he has

offered inconsistent explanations.  The Court rejects this

argument and finds no inconsistencies.  Plaintiff asserts that

_____

    [6] In a footnote, Plaintiff asks the Court to consider the
fact that another African American employee brought an EEO
complaint involving Stewart.  The mere fact that another employee
brought charges of discrimination, without any further detail, is
not admissible evidence of discriminatory treatment and the Court
will not consider it as such.

Stewart's claim that he chose Bissell over Plaintiff based solely on the interview is inconsistent with his later testimony that he considered each applicant's Form 991 and their past performance. That Stewart considered each applicant's complete application is not inconsistent with Stewart's statement that the sole deciding factor between Plaintiff and Bissell was Plaintiff's inability to answer basic questions about work at the Philadelphia L&DC. Plaintiff does not quarrel with the decision from USPS Human Resources that Bissell was qualified for the position.  It must be noted that Plaintiff was given an MDO position, so her very poor performance during the interview did not foreclose a management position, and presumably her allegedly excellent employment record at USPS provided the basis for this appointment.[7]

The Court similarly rejects Plaintiff's suggestion that the interview process itself was tainted by Stewart as a means to obtain his allegedly discriminatory purpose.  While Plaintiff has

_____

[7] In this way, among others, the Court distinguishes both cases on which Plaintiff relies, Lynch v. New Deal Delivery Serv. Inc., 974 F. Supp. 441, 452-55 (D.N.J. 1997) and Cinelli v. U.S. Energy Partners, 77 F. Supp. 2d 566, 578 (D.N.J. 1999).  In Lynch and Cinelli the plaintiffs were terminated allegedly based on their poor work performance, but neither plaintiff was notified of their poor performance or provided an opportunity to improve. In this case, Plaintiff was not terminated -- rather, she was denied what was essentially a promotion, but permitted to retain a managerial position at the same salary (after her old position was eliminated through restructuring).  There is no evidence suggesting that Plaintiff's past work performance was used against her.

offered evidence that Stewart had the "option" of using a review committee, the mere fact that Stewart chose not to use this optional process -- perhaps because it is more cumbersome when only seven applicants were to be interviewed -- is not evidence of misconduct.

Nor has Plaintiff offered evidence from which a jury could find that Stewart was manipulating the interview process. Stewart's decision to count Bissell's answer of 6.4 million as correct when the exact answer was 6.3 million, while counting Plaintiff's answer of 4% to be incorrect when the correct answer was 3.5%, raises no red flags.  The proportionally minuscule difference between 6.4 million and 6.3 million (approximately 1.6% difference), as compared to the difference between 4% and 3.5% (approximately 14.3% difference), is obvious and justifies Stewart's decisions in both cases.  Even if, for the sake of argument, one might regard a 14.3% math error as equivalent to a 1.6% math error, the difference of opinion whether they are equivalent is not material here.  Overall, Plaintiff correctly answered only 12 out of 25 questions, while Bissell was correct on at least 23 answers out of 25 questions, even if his 1.6% miscalculation is deemed incorrect.  His interview performance was demonstrably and dramatically better than Ms. Green's.  The Court finds that no jury would discredit Stewart's hiring decision based on the interview process.

Nor is Stewart's decision to keep Plaintiff on the QIM detail or Plaintiff's alleged exclusion from staff meetings while on detail evidence that Stewart's hiring decision was more likely than not discriminatory.  Plaintiff insinuates that Stewart placed her on the QIM detail in early 2004, and kept her in that position, in anticipation of the restructuring in 2006 in order to undermine Plaintiff's ability on the interview.  Plaintiff, however, offers no evidence to suggest that Stewart asked her to take the QIM detail (arguably an important job) because of her race, nor does she offer any evidence to discredit Stewart's reasons for keeping her in the position -- that performance quality was still a problem.  The fact that details are usually shorter than Plaintiff's detail is not evidence of racial animus or Stewart's intent to undermine an interview process held approximately a year after the appointment.  Plaintiff's speculation does not create a material dispute of fact.  See Acumed LLC v. Advanced Surgical Servs., 561 F.3d 199, 228 (3d Cir. 2009)  ("[S]peculation and conjecture may not defeat a motion for summary judgment." (citation omitted)).  Likewise, Plaintiff's vague allegation that she "was regularly excluded from staff or MDO meetings" is not evidence that Stewart acted with a discriminatory motive.  Plaintiff does not allege that Stewart, or any other USPS official with hiring power, was involved in this alleged exclusion; in fact, she does not

identify the responsible individuals.  Plaintiff has not offered any evidence to support her speculative argument that Stewart implemented a scheme beginning in 2004 to undermine Plaintiff's future career opportunities because of her race or gender.  See Lexington Ins. Co. v. W. Pa. Hosp., 423 F.3d 318, 333 (3d Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (quotation marks and citation omitted)).

Finally, the Court will briefly address Plaintiff's claim that Stewart called her a "black gorilla."  Though certainly an extraordinarily offensive comment, Plaintiff has not offered any admissible evidence showing that Stewart actually made such a statement.  Instead, Plaintiff offers her own testimony that Anthony Key told her that Alva Hall told him that Hall overheard Stewart make the abusive remark.  This is hearsay within hearsay and Plaintiff cannot show that both levels would be admissible. Though Stewart's own statement would be admissible as an admission of a party opponent under Rule 801(d)(2)(A) of the Federal Rules of Evidence, Hall's statement to Key and Key's statement to Plaintiff do not fall into any exception to the hearsay rule, especially in light of Hall's testimony that she heard no such remark, would be inadmissible and cannot be used on summary judgment.  See Smith v. City of Allentown, 589 F.3d 684,

693-694 (3d Cir. 2009) (hearsay within hearsay, where no exception applies, cannot be considered as evidence on summary judgment).

In sum, the Court has considered the evidence and argument offered by Plaintiff to attack Defendant's non-discriminatory reason for offering Bissell and not Plaintiff the Lead MDO post, and finds that Plaintiff has failed to offer evidence from which a fact-finder could either disbelieve that reason or find that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the Stewart's action.  The Court will therefore grant Defendant summary judgment on this claim.

   **C.   Hostile Work Environment**

Plaintiff seeks to pursue a claim for an allegedly hostile work environment at the Philadelphia L&DC.  Defendant responds that Plaintiff has failed to exhaust her administrative remedies regarding any hostile work environment claim and that such a claim fails on the merits.  The Court concludes that Plaintiff failed to raise a claim regarding hostile work environment in her EEO complaint and so she may not raise such a claim here.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, establishes the virtually exclusive remedy for federal employees who allege discrimination in the workplace.  Under Title VII, before an aggrieved party can seek judicial relief,

they must fully exhaust the required administrative remedies.
Robinson v. Dalton, 107 F.3d 1018, 1020-21 (3d Cir. 1997); see
McKart v. United States, 395 U.S. 185, 193 (1969).  Courts
require Plaintiffs to exhaust these remedies in order "to promote
administrative efficiency, respect executive autonomy by allowing
an agency the opportunity to correct its own errors, provide
courts with the benefit of an agency's expertise, and serve
judicial economy by having the administrative agency compile the
factual record."  Robinson, 107 F.3d at 1020 (quoting Heywood v.
Cruzan Motors, Inc., 792 F.2d 367, 370 (3d Cir. 1986))(internal
quotes omitted).

     Plaintiff did not raise her hostile work environment
allegations in her EEO complaint.  That complaint focuses
entirely on her transfer to the QIM detail, Stewart's refusal to
return her to her MDO Tour 3 post, and the denial of the Lead MDO
position.  Even her one reference to a "hostile work place," is
made in the context of her failure to promote claim.  (Def. Exh.
29.)  She asserts that USPS failed in its duty "to act with
reasonable care in providing a reasonably non-hostile work place"
by "failing to maintain fair competition among Swedesboro Job
applicants . . ."  (Id.)  As a result, the only claim
investigated by USPS was Plaintiff's employment discrimination
claim.  (Def. Exh. 30.)  Plaintiff, despite being provided an
opportunity to object, did not raise any objection to the scope

of the investigation.  Therefore, because Plaintiff failed to
exhaust her administrative remedies as to any hostile work
environment claim, she cannot bring suit in this Court.[8]
See Killingsworth v. Potter, 307 F. App'x 685 (3d Cir. 2009)
(affirming grant of summary judgment to defendant where plaintiff
failed to exhaust her administrative remedies under Title VII).
The Court will grant summary judgment in favor of Defendant as to
Plaintiff's hostile work environment claim.

---

[8] Moreover, had Plaintiff exhausted her administrative
remedies, she has failed to submit evidence showing that her
workplace was "permeated with discriminatory intimidation,
ridicule, and insult, that is sufficiently severe or pervasive
to alter the conditions of [her] employment and create an abusive
working environment[.]" National R.R. Passenger Corp. v. Morgan,
536 U.S. 101, 116 (2002) (internal citations and quotations
omitted).  Her claims that she was teased by a co-worker for
being "demoted," that Stewart did not introduce himself to her
when he first arrived, that a supervisor complemented her hair
without braids, that Theresa Bonhage told her prior to Stewart's
arrival that she got her position solely because of her race, and
the circumstances of her QIM detail, do not amount to the sort of
intolerable harassment required to show a hostile work
environment.  Though Plaintiff has pointed to rude and
insensitive comments (as discussed above, she has not offered
admissible evidence that Stewart made any offensive remarks), she
has not offered evidence from which a jury could find a hostile
work environment.  See Perry v. Harvey, No. 08-3339, 332 F. App'x
728, 731 (3d Cir. 2009) ("Title VII is not a 'general civility
code . . . [T]he ordinary tribulations of the workplace, such as
the sporadic use of abusive language, gender-related jokes, and
occasional teasing' do not support a hostile work environment
claim.") (quoting Faragher v. City of Boca Raton, 524 U.S. 775,
788 (1998)).

## III. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment.  The accompanying Order shall be entered.


**June 23, 2010**                                 **s/ Jerome B. Simandle**
Date                                               JEROME B. SIMANDLE
                                                   U.S. District Judge